South Carolina Attorney General's Office. I'm representing all of the appellants from the state as to both of these cases that have been consolidated for purposes of this appeal. And this appeal is from the district court judge, judges granting a preliminary injunction as to three parts of South Carolina's immigration related law, Act 69 of 2011. The first issue I would like to address is that we believe that the low country plaintiffs, the individual plaintiffs and organizations do not have a right of action in this case and that their actions should be therefore dismissed. They proceed under two theories, 1983 and Ex parte Young, but they do not have an enforceable right in this case. The 19th Gonzaga case said that in 1983 there must be a right accorded somewhere to be able to do that. The Maryland Pest Control case from this circuit said that the Supremacy Clause does not create rights. The Douglas dissent addressed the issue. The majority opinion did not get into that issue, but the Douglas dissent of four justices made clear that they believe that there was no right of action under the Supremacy Clause that could be asserted absent a federal statute authorizing such a right of action and none of the federal acts asserted in this case give plaintiffs a right of action here for purposes of 1983. The Day case from I believe the 10th circuit is in accord with these views. Now the Douglas dissent did suggest that maybe Ex parte Young might provide a right of action for the low country plaintiffs in this case, I mean for the federal right and the Supremacy Clause just does not do that. Pennhurst's case makes clear that there must be a need to promote, that Young rests on a need to promote federal rights. The Volcker case of this circuit is in accord that there must be a federal right. The Leaf case from the 11th circuit, the Chapman case and Brunner cases from the Supreme Court, U.S. Supreme Court, also indicated that there must be a related federal right to be able to assert that right under Ex parte Young. The Dow article that we cited in our briefs said that the issue remains undecided by the Supreme Court. So we believe for those reasons that the low country plaintiffs have failed to assert any right here, any cause of action that can be addressed by this court and that their entire case should be dismissed for that reason. We also believe that the district court failed to apply principles of abstention to this case. We recognize that strict Younger abstention for ongoing criminal prosecution does not apply here because we don't have an ongoing criminal prosecution. Nevertheless, Young indicated very clearly that when there is a threatened prosecution, as the plaintiffs claim there is here, the low country plaintiffs, that there should be the same principles of comity and federalism, including a requirement that the harm asserted be great and immediate. We believe... Your Honor, I don't believe so in the Glard decision. Well, the Alabama decision, one of the issues, right of action, abstention, was raised in one of the two cases, Alabama and Georgia, and I apologize, I can't recall which it was. I believe it might have been abstention, and I believe the court ruled against the state on that. But the Russia case, Russia, however, it's pronounced from the First Circuit when Justice Breyer was sitting as a Court of Appeals judge, applied abstention, comity and federalism provisions, considerations to a threatened prosecution, so did the Bacon case from the Eighth Circuit, so did the Spence and Asian Majority decisions of this circuit, and the Fenner, which was pre-Younger of the U.S. Supreme Court, indicated the federal court should exercise caution as to threatened prosecutions, and the Morales case from the U.S. Supreme Court said that there should be heightened concern in those instances, but it did not apply in that particular case. We recognize that the United States said, well, the United States is not being threatened with prosecution, so abstention should not apply to them. Their concern is that the district court judge did not apply proper principles of comity and federalism. He allowed the parties to come in on a facial challenge and say, oh, well, this is bad, it should be enjoined, and he showed no consideration of application of these principles to the United States case, as well as to the Lowcountry case. I don't know, perhaps the United States could, if there was some issue with state government over the application of one of these statutes, perhaps then it could raise it. Perhaps, I don't know, I'm not conceding this, there would be a right of a state clerical judgment action. But the problem here is that the district court judge simply did not address comity and federalism as to the United States, as well as to the Lowcountry plaintiffs. But even if this court were to find that abstention is not appropriate as to the United States, we've got a separate case brought by the Lowcountry plaintiffs, and the court could still find that abstention was appropriate as to the Lowcountry. In addition to the younger considerations, there's also Missouri v. Jenkins, just general restraints on federal equity power, of federalism, separation of powers, and those were not applied here. We have two provisions that are principally at issue in this case. There is the fifth provision regarding section, I mean the third provision, section five of South Carolina's law regarding requirement that persons present carry registration papers. We recognize that U.S. v. Arizona addressed a very similar provision under Arizona law and upheld the injunction of that. We're not arguing against that. We simply preserve our defenses on that. The other two provisions, the first of which is section four of South Carolina's law regarding harboring, transporting, sheltering persons unlawfully present in this country. There are two aspects of this. Sections B and D apply to third parties taking this action. Sections A and C apply to persons taking this action themselves, those who are unlawfully present. The complaint from the plaintiffs in this case is that this amounts to a requirement of criminalizing simple presence in this country. But that's not what this does. Under A and C, there has to be affirmative steps taken by the person unlawfully present in order to trigger the application of that statute. They have to act with regard to, under both the third party provisions of B and D and A and C, there has to be either an intent to avoid detection or there has to be an intent to further the unlawful presence into this country. So it's not a simple, you've committed a crime because you're here type provision. The Arizona case set four standards for field preemption. They said that there had to be either a framework so pervasive that there would be no room for the state to act and there had to be a federal interest so dominant that it was presumed that the federal law would control it. Arizona found that those standards were met as to the alien registration provisions at issue under Arizona law. The plaintiffs try to apply that framework to the harboring sheltering provisions of section four. But we don't believe that it applies. The registration provisions were much more comprehensive. Under the federal related harboring provisions under section 1324, it simply applies or creates a federal crime for movement in this country unlawfully in accordance with the terms of that statute. It's fairly similar to South Carolina's law and the penalties are fairly similar, I believe, at least at the initial stage. The Foxfield, Ohio case that we cited from the 19th century addresses what we believe is an analogous provision. It's not the same one. But in that case, the court recognized that the federal government had power over the minting of money and the counterfeiting of money, but it nevertheless said a state could pass a law prescribing the transfer of counterfeited money within that state. That's essentially what South Carolina has done here with regard to the immigration. The courts have said that the federal government controls the entry of persons into the United States. It has the field occupied as to registration, but the state is not precluded from restricting by criminal penalty the unlawful movement sheltering, harboring of persons with intent to avoid the law, just as the state could restrict the movement of money in Foxfield, Ohio. A number of state court cases have addressed similar issues. I realize that they're not binding on this court, but they are of guidance. The Jose C. case from California in which the court, for purposes of determining whether a juvenile could be made a ward of state, adjudicated whether that person had violated a federal immigration law. The Flores case from Arizona applied its law to allow the human smuggling law and rejected a preemption challenge to that. The Barajas case from California said the federal provisions allowing states to make arrests under 1324C did not preclude arrests under other federal provisions, and that's a rejection of an argument that was made in this case. In the Jose C. case, they said the granting of jurisdiction to the federal courts under 1329 for prosecution of the covered federal crimes by the U.S. attorney in the U.S. District Court did not deprive state courts of jurisdiction of matters that could be violated in California. And Colorado said that under section 1329, the state courts could exercise jurisdiction as to state laws regarding immigration, but it did not reach the merits of whether there was a supremacy clause violation in that case. As to your argument that the acts self-harboring and self-transporting provisions don't punish mere unlawful presence, the District Court noted that it's hard to imagine that an unlawfully present person wouldn't necessarily be required at some point to move or shelter himself or herself as an unlawfully present in a location or community. And I didn't entirely understand your response to that framing of the issue. The law does not criminalize presence or movement unless it is done with an intent to avoid detection or an intent to further unlawful entry into this store to buy food is not self-transportation and a violation of this law. Well, it is self-transportation, but it's not a violation of this law. It's self-transportation and it's to provide sustenance to remain in this country unlawfully. I understand, Your Honor, but just on those basic facts, I don't believe that it could be said that it would be an intent to avoid detection or an intent to… I understand Your Honor's point, but I don't think it would be an intent for criminal purposes. It would be simply to eat, which everybody has to do. And I believe, Your Honor, that this points out how we're on a facial challenge. And on a facial challenge, the courts look to whether the statute has a legitimate sweep under Salerno. We look to whether if that test is applied, whether there's no conceivable circumstances under which the law could be valid. Certain hypotheticals in which there might be seen to be a problem are ones that should be addressed by the state courts in the first instance. And in the context of a prosecution in which these defenses could be raised rather than a sweeping ruling by this district court in joining the entire law. I've addressed field preemption as to Section 4 under conflict preemption. The Arizona case said that there had to be no… It had to be physically impossible to comply with both the federal law and the state law. And that's not the case here. They're very similar. And the state law had to be an obstacle to federal enforcement. We do not believe that South Carolina law is. The Plyler case referred to a state law mirroring federal objectives and furthering a legitimate state goal. And we believe that this law does that, because it allows the state to address criminal behavior by persons unlawfully present within the state. The plaintiffs have said, well, there's an exemption in the federal law that's not there in the state law, the ministerial exemption in the federal law. But there is an exemption in South Carolina for church programs. And we believe that also under South Carolina law that when the intent has to be shown to avoid detection or further unlawful presence, that a minister preaching to his congregation or undertaking pastoral activities would not meet those standards. So South Carolina would not be criminalizing acts that would be otherwise exempt under federal law. The Lanza case said that a crime against both the state and the United States can be punished by each. It's a crime against both sovereigns. And South Carolina has addressed that here. I would also add that if, for the sake of argument, the court had a problem with the self-harboring, self-transportation provisions of paragraphs 8 and C of section 4, that it could sever those from B and D, which apply to third parties and are quite similar to the federal law. I also would note, too, that under the federal law, there is a provision for conspiracy with regard to federal harboring and transportation. And that, we believe, could apply to third parties just as sections A and C of South Carolina law does. The final provision I want to address is the fraudulent ID under section 6B2. There are two federal counterparts to that. The plaintiffs contend that this is field preempted by the ruling regarding registration under U.S. v. Arizona. We believe it's different. We believe it addresses fraud. And when the state can ask somebody for their identification for being in this country, that the state can say, can prosecute somebody who produces a fraudulent ID, which could include a fraudulent driver's license or other identification. Finally, we would ask that this court go on ahead and rule on the merits. We believe that this is a facial challenge, and we believe we have shown that there's not a legal basis for these actions by the plaintiffs. And we believe that for judicial economy, it would be good for this court to go on ahead and address the merits of those issues. If there are no further questions, my time is up. Thank you, Mr. Smith. Mr. Tenney? May it please the Court, Daniel Tenney for the United States. The Supreme Court set out in the Arizona decision the principles that govern this appeal. First, that the role of establishing and implementing immigration policy in the United States is reserved to the national government. And relatedly, to carry out those services, national government needs to have the discretion and flexibility to enforce the federal standards in the matters that the national government sees fit, in order to accommodate the competing interests, which include humanitarian concerns, enforcement concerns, and the effect that policies that affect, by their very nature, foreign nationals in the United States have on this country's foreign relations and relationships with other countries, which can only be carried out, as the Supreme Court has repeatedly recognized, by the national government and not by the several states individually. The provisions at issue here are criminal provisions, each designed to enforce federal immigration laws. And the Supreme Court made clear in Arizona that the enforcement of federal immigration laws is a matter left to the federal government. There are roles for states, which include cooperation with the federal government, but these provisions are attempts to prosecute crimes in state court, subject to state prosecution, by interpretation by state court, subject to the discretion only of state prosecutors, and cannot be reconciled with the federal scheme, in which crimes against the United States are prosecuted by federal officials in federal courts, subject to the discretion of federal officials, who can take into account the considerations of all the states and of our relationships with foreign nations. Speaking specifically to the harboring provision, the analogy to Fox v. Ohio, which was a counterfeiting provision, highlights the distinction between provisions of that nature and the provisions at issue here. In Fox, the concern that the state was addressing was that counterfeit coins were being used to steal money or steal goods and services. People were passing off counterfeit bills or counterfeit coins in order to receive goods and services in exchange. And the state has a traditional interest in protecting and enforcing criminal laws that affect the theft of money or larceny or other things of that nature. And the Supreme Court held in that case that the crime against the federal government related to the counterfeiting itself, and there was only an ancillary concern with respect to the passing off of the money. That was the distinction there. Now here, each of the crimes that we're talking about, the harboring provision and the fraud provision, the underlying conduct that is being punished relates to being in the United States unlawfully. That is a crime against the federal government. It is not a crime against the state, as the Supreme Court recognized in Arizona and has been established by a number of cases. And it's also just at the very basic nature of what an immigration policy is. So the state hasn't identified a traditional area of state responsibility other than something so generic as protecting public safety that could sweep in almost anything they would try to do. So it's very different then from the Fox v. Ohio case where the state was enforcing a criminal law that was related to larceny. Similarly, with the fraud provision, the fraud provision applies only to presentation of documents for the purpose of establishing lawful presence in the United States. This is a specific provision that is addressing an immigration policy. There's no secret what the state is doing here. The state is trying to address what it perceives as an inappropriate number of unlawfully present aliens in the state of South Carolina. That's evident on the face of the provisions that issue in this bill. That's evident from the legislative history which is cited in the briefs in which the governor and the Senate sponsor both said that they wanted unlawfully present aliens to find other states to go to, that the intent of the law was to make South Carolina inhospitable to such persons. That is not the way immigration policy is carried out in the United States. The way immigration policy is carried out in the United States, as the Supreme Court explained in Arizona, is that removal of aliens from the United States is conducted by federal officials, typically through civil proceedings, subject to the discretion of the federal officials who are charged with the nation's immigration policy and foreign relations. With respect to the point regarding respecting state courts' ability to hash these issues out, either with respect to it being a facial challenge or with respect to federalism concerns, the federalism concerns here point strongly in favor of the preliminary injunction that the district court entered. The very state prosecution of persons suspected of violating the federal immigration laws itself causes irreparable harm because it is an attempt to prosecute persons who the federal government may or may not have determined it's appropriate to prosecute under the federal immigration laws. And this is not a case where, again, where a state is acting in an area of traditional state responsibility. The Supreme Court, in other cases, like in the Crosby case and the Garamendi case that are cited in our brief, rejected attempts by states to couch their attempts to engage in something that bore on foreign policy in a traditional area of state authority. In the Crosby case, for example, the state was determining with whom the state itself would enter contracts. Now, obviously, state contracting is an area of traditional state responsibility, but the Supreme Court unanimously looked behind that and determined that what the state was actually doing was refusing to contract with entities that were engaging in business with Burma. And because the question of how to address the situation in Burma was a question for the national government, the state couldn't address that indirectly by using its contracting power to effectuate what was, in effect, a foreign policy decision. Similarly, the state can't say, well, we're not going after the aliens themselves, we're just going after the people that they associate with, maybe their friends and family, and therefore it's not an immigration policy. It's the same problem. In the Garamendi case, it was an insurance disclosure requirement. The question in the Garamendi case was whether California had the authority to require insurance companies to disclose insurance policies that had been issued during the Holocaust era. And, of course, states have traditional responsibility over insurance, the regulation of insurance, and the Supreme Court recognized it in the opinion, but the Supreme Court nonetheless struck down the disclosure provision because they said it is clear what the state is doing here. They are trying to effectuate a policy with regard to how to deal with insurance claims from the Holocaust era. And that is not a policy that is the role of the state. And the Supreme Court specifically addressed the question of, suppose the state thinks that the federal policy is not the appropriate policy, and said, well, that is not a question that the state has authority to address. That is a matter reserved to the national government, and the national government can make determinations. And the only way this can work is that the national government has to be able to speak with one voice with respect to the policies at issue there, and similarly with the immigration policies at issue here. So, for those reasons, we think that the harboring provisions, both the ones targeted directly at the allegedly, according to the state courts, unlawfully present alien, and to their associates are preempted by federal law. We think that the fraud provisions, which counsel has conceded, are mirroring a comprehensive, he didn't say comprehensive, are mirroring a scheme of fraud provisions in the federal law, both criminal and civil, designed, again, to effectuate the federal government's interest in protecting the sanctity of the federal immigration system. And this is a matter that the Supreme Court reiterated in Arizona is left to the national government. With respect to the younger issue, although it was addressed primarily, I think, to the private plaintiffs, it's a similar point. The harm that's visited on the United States here is not one that can be avoided by a successful defense in a state prosecution. If an alien or an associate of an alien were prosecuted in state court, and even if they could successfully raise a preemption for defense in those proceedings, that would not eliminate the problems with prosecuting nationals of foreign countries not subject to the discretion of federal officials. It would not eliminate the international impact of state prosecutions of foreign officials, and it would do nothing to ensure that the immigration policy of the United States is set solely by the national government. Unless there are any additional questions. Thank you very much. Ms. Tumlin? Good morning. May it please the court, Karen Tumlin on behalf of the Low Country Immigration Coalition, the private plaintiffs. To begin with, South Carolina's Act 69 is not merely an effort to enforce federal immigration law. Indeed, it's an effort to create and enforce South Carolina's own immigration policy. And that is something the Supreme Court told us with its Arizona decision last term states clearly cannot do. The two provisions at issue on this appeal, Section 4, dealing with harboring and transporting, and Section 62, dealing with aggravated identity fraud, fail for the same reasons articulated by the Supreme Court in its Arizona decision last term. First of all, the Supreme Court's decision in Arizona reaffirms the dominant interest of the federal government in terms of setting the nation's immigration policy and speaking with one voice on immigration matters. It also reaffirms that Congress in its decision-making over immigration policy has left only the narrowest of roles for state and local law enforcement officers in terms of enforcing that immigration policy. How would the cooperative relationship contemplated under the INA manifest itself? What would it look like? So a couple of examples of that, and I don't think we have to guess at this because Congress has articulated it and the agency itself has provided guidance. So first, to start with Congress. The flagship cooperative relationship that Congress has articulated is in 8 U.S.C. 1357G. That is, and again, the Supreme Court decision discusses this. It says, Congress has seen fit that there are occasions on which it wants to enter into a contract to train state and local law enforcement officials in order to carry out federal immigration enforcement duties. And to do so, they do a couple of things. Number one, they recognize, as the Supreme Court has recognized in its Padilla decision, that federal immigration law is incredibly complex, and to carry it out properly and not raise the concerns that the Supreme Court has had about harassment of noncitizens, you need to be trained. And I'm sorry, I don't mean to interrupt, but I think my question just wasn't clear. Is it possible for a state to enact legislation that would operate within those confines other than by establishing the contractual relationship provided for? The instances we're discussing here, absolutely not, and here's why. No, I wasn't referring specifically to South, I'm asking abstractly. So abstractly. Referring to the legislation. So abstractly, it is instructed that the Department of Homeland Security has put out official guidance on cooperation of state and local law enforcement officers in federal immigration policy, and they give examples of what that would look like. And in each of those examples, the cooperation has to be driven by and dictated by the federal government. They say things like, we will call you and tell you that we want to do a joint enforcement action, and we will ask for your participation. But that cooperation is always, it has two flagships. One, it's initiated. It's federally initiated. Correct. Federally initiated. Sorry, Your Honor, please. No, I'm sorry. I really did not mean to interrupt or derail your presentation, but I do think I understand your response. I'm much happier to answer the court's questions. I think that's more instructive for all of us. You did so very well. Thank you. Certainly. So turning back to the merits of Section 4 and Section 62, speaking specifically about Section 4, the harboring and transporting provisions, and to talk a little bit about what's already been presented to the court this morning. So, indeed, South Carolina's law has two provisions that go to self-harboring and self-transporting. This makes it even more clearly preempted than all of the other state provisions that have recently been dealt with in this area. And as we've noted in our briefing, each court that has considered one of these state laws has unanimously found it to be preempted. The question that the court posed to the state was, can ordinary activities be criminalized under these provisions? And the state has said, well, you can't criminalize just driving yourself to the grocery store. But this court, of course, has to be guided by the text of the statute itself. There is nothing in the text of 4A and 4C that makes it clear that these kind of ordinary behaviors, which are, of course, part and parcel of keeping yourself in the country without lawful status. You have to buy food. You have to go to work. Perhaps you go to school. If you drop your children off at school, it's part and parcel of remaining here. But Mr. Smith clarified that the transportation must be to avoid detection or capture. Yes, that language, actually, that's not the exact language of the statute. The exact language of the statute is something more in furtherance of their unlawful presence. I thought it was both. It's both. In furtherance of and to avoid. Your Honor's correct. It's in furtherance of your unlawful presence or to avoid. And I would say a couple of things. The in furtherance piece, the first phrase, is fairly akin to the federal provision, even though there's no self-harboring or transporting. That provision has been in place for over a century. It was enacted in 1907. It's been the subject of active interpretation in all the circuit courts. And generally, it does not criminalize activities such as driving yourself to the grocery store. However, even the circuit courts are not entirely clear on when it is that in furtherance of remaining is something that has to be really in furtherance of either avoiding apprehension or it's just, for example, going to a job that puts food on your table to feed your family to keep you here in the United States. And the fact that there is nothing in the text of Section 4 that requires prosecution to follow the federal model makes it clearly preemptive. I wanted to speak a little bit about the state's argument also that there's a notion that there may be concurrent jurisdiction over harboring or transporting. So as we are guided again by the Supreme Court's decision in Arizona, where they use the particular section in the INA, in the Immigration and Nationality Act, where Congress directs what states can do in terms of arresting for immigration violations. So 8 U.S.C. 1324C provides that states may arrest for violations of the federal harboring and transporting statute. And in its analysis there, when the Supreme Court was looking at a warrantless arrest provision, so Arizona had attempted to pass a warrantless arrest provision for individuals who were potentially in violation of civil immigration laws. And the Supreme Court said, wait a minute. You can't do this. When Congress wanted you to have arrest authority over federal immigration matters, it said so. It's in 8 U.S.C. 1324. It's limited to this specific statute. And by negative inference, we know that Congress did not intend to give you any other power to arrest. The same logic applies with equal force here. Obviously, the Lanza case, which was cited by the state in terms of potentially getting an idea that there could be concurrent enforcement in this area, is not applicable. That case, as the Court no doubt is familiar, is a prohibition case. And there, of course, the prohibition amendment specifically gave concurrent enforcement to both states and the federal government. So I'd also like to emphasize with respect to the Section 4 of the harboring and transporting provision, the things that the state does not contest. So as we've already talked about, the state does not contest that this provision creates crimes for self-harboring and self-transporting. They do argue, perhaps, that because there's conspiracy provision under federal law, that maybe this is an out of step with federal law. The simple fact is, however, that conspiracy provision has not been interpreted and the state can point to no case where the federal government has tried to use that to criminalize self-harboring or self-transportation. This would be an enormous leap from federal law in what is criminalized behavior. Secondly, the state doesn't contest that South Carolina is under no obligation to make its prosecutorial decisions under this regime in a manner that fits with federal interpretation of the statute. And finally, South Carolina does not contest that both the United States and 16 foreign governments have weighed in to say that this law raises foreign relations concerns, precisely the concerns that were on the mind of the Supreme Court in the Arizona decision. Turning to Section 62, the Court has no further questions on the harboring provision. As we've outlined in our briefing, the decision making about when to criminalize presentation of a false document for the purposes of establishing immigration status is extensively regulated in federal law. There's well over 10 statutory provisions dealing with this. This gives rise to the kind of field preemption argument the Supreme Court found in its Arizona decision last term. Without question, the federal government has provided a full set of standards dealing with this area. South Carolina's argument that actually this is an area of state concern and we're dealing with fraud is belied by the plain text of the statute. If the concern was to criminalize possession or use of false identity documents in general, there would be no need to tie this provision solely to for the purpose of establishing immigration status. At heart, this is a provision that is going to help people represent themselves to be lawfully president of the United States or not. And for those reasons, it is preempted. I would like to briefly address the argument that the Lowcountry Immigration Coalition has challenged in private plaintiffs' lack of a right of action to bring this challenge. We've covered this in our briefing. However, the Supreme Court has routinely found, as has this circuit, that private litigants have a right of action or, more specifically, have gone on to address the merits of preemption claims by private litigants without precisely locating that right of action either in a federal statute or the supremacy clause. I would say, and the state's argument is, the dissent in Douglas raises doubt on whether or not this continues to be the case, that private litigants have this right. There's one circuit and one circuit alone that has addressed this issue clearly following the Douglas decision. That's the 11th Circuit in Farr. And that court said it had no difficulty finding that plaintiffs clearly had an implied right of action under the supremacy clause, even absent explicit statutory authorization. Before Douglas, nothing short of eight circuits had already found that there was an implied right of action for private litigants under the supremacy clause, even when there wasn't an explicit statutory enforcement mechanism. And then, just because it is, of course, the opinion of the decisions of this circuit, the state has cited the Maryland Pest Control case as an example that might undermine the private plaintiff's right of action. The decision that they're citing is actually Maryland Pest Control 2, which was dealing simply with the issue of attorney's fees. And rather, 1983 gave rise to attorney's fees in that action. And this court found it did not. The prior Maryland Pest Decision, of course, addressed the merits of the private plaintiff's preemption challenge. And there's no reason following Douglas to depart from that. If the court has any further questions, I would conclude then with the issue of Younger. The court asked whether, I believe it was Judge Agee, asked whether Younger was dealt with in the Arizona-Alabama or the Golara decisions. And I would give two responses to that. First, Younger is dealt with in brief, and specifically in the Georgia decision, the Golara decision at 691 F. 3rd, 1258. And then, the principles of comedy and federalism that underlie Younger are really riddled through and all over the Arizona decision itself. And so, although the specific argument that the state's raising here was not raised directly in those cases, the concerns and the questions of, and ensuring, quite frankly, that states are given their due report and that principles of comedy are taken into effect were front and center in the Arizona case and on the lines of the Supreme Court decision. And you see that in its analysis. And it was also dealt with specifically by the 11th Circuit and the Georgia community. If there's nothing further, I think that would conclude for today. Thank you very much. Thank you. Mr. Smith? Thank you, Your Honor. Counsel is correct that Golara did address the right of action. There was no petition certificated from that decision, however. But more importantly, the Golara decision, the Georgia Latino case, did not, quote, cite the Leaf decision. That's the name of the organization that was a plaintiff. We cited in the Aram briefs an earlier 11th Circuit's decision that found that there had to be a right of action in order to assert an ex parte Young claim. And it's really against them on this issue. And we believe that the other authority that we have cited is as well. And the fact that the U.S. Supreme Court has taken up supremacy challenges brought by individuals does not mean that that issue has been raised. And where it has been raised, there are indications that the court would not find any right of action sustainable on the basis of the supremacy clause alone. And plaintiffs said that, well, Maryland Pest Control, in which this court said that a supremacy clause would not support a right of action, itself, she said, well, that was just the attorney's fee decision and there was an earlier decision addressing the merits. And that's correct. But that earlier decision did not address any right of action issue. So apparently it was not raised or not addressed. But it was as to the attorney's fees. And the court ruled against them. And they didn't have a right of action. And the low country plaintiffs did not hear as well. Regarding Section 4, the harboring provisions, it does have to be an intent to further unlawful entry or to avoid detection. And ordinary activities I do not believe a South Carolina court would find were intense to further unlawful entry. But that just points out the very reason why a South Carolina court should be addressing this in the first instance, rather than a federal court in a sweeping ruling on a facial challenge. There was also a question about federal-state cooperation. And I'm not sure whether this goes to what Your Honor said. And I believe that this came up in oral argument in the district court. So I don't believe I'm talking outside the record here. Certainly that's not my intent. But under Section 287G of federal law, there is a way of entering an agreement between the federal government and the states for enforcement purposes. And the states are given certain authority to act pursuant to those agreements. My understanding is that there are some agreements that have been in place in a while in South Carolina. But as of the oral argument on remand in South Carolina back in the fall, my understanding was that the federal government was no longer entering new agreements with the state of South Carolina or localities pursuant to that provision. Now, there are, as I understand it, certain federal task forces in which states and federal officers work alongside each other in a cooperative manner. But the state officials do not have any independent authority. They're subject to federal control. In those situations, they lack the authority that they would have under the 287G agreement, which leads to how Section 4 does not interfere with federal enforcement. It creates a state crime that parallels the federal crime. The plaintiffs raise all these horrible possibilities and claim interference with foreign governments. We're talking about prosecuting an individual for furthering, concealing their presence in South Carolina or furthering their unlawful entry by affirmative acts in South Carolina. Again, these are issues that could be addressed by the state court in a prosecution. It's not appropriate for a sweeping preliminary injunction, as we have here, that failed to consider federal provisions, I mean, commenting federalism considerations. Thank you. If there are no further questions, Your Honor, that is all that I have to add at this point. Thank you very much, Mr. Smith. I will ask the courtroom deputy to adjourn court for today. We will come down and re-counsel. Thank you. This honorable court stands adjourned until tomorrow morning at 9.30. God save the United States of this honorable court.
judges: Allyson K. Duncan, G. Steven Agee, Andre M. Davis